[No. 80006-5. En Banc.]
Argued May 31, 2007.    Decided January 3, 2008.

RESIDENT ACTION COUNCIL, *Respondent*, v. THE SEATTLE HOUSING AUTHORITY ET AL., *Appellants*.

*James E. Fearn, Jr.* (of *Seattle Housing Authority*), for appellants.

*Eric Dunn* (of *Northwest Justice Project*), for *respondent*.

¶1 C. JOHNSON, J. — This case involves a challenge to a housing regulation prohibiting the posting of signs on the exterior of resident apartment doors. The superior court granted summary judgment to Resident Action Council

(RAC), enjoining enforcement of the regulation. The superior court held that the regulation violated residents' free speech rights under the United States and Washington Constitutions.[1] Seattle Housing Authority (SHA) appealed and we accepted certification. We affirm.

## FACTS

¶2 SHA is a public housing authority, organized under the state Housing Authorities Law (ch. 35.82 RCW). Among the low-income housing programs it operates is the low-income public housing (LIPH) program, which is funded in part by the federal government. Clerk's Papers (CP) at 160. There are roughly 5,300 LIPH units in Seattle.

¶3 Tenancies in LIPH facilities are governed by lease agreements. SHA issues "house rules" which tenants must sign and are incorporated by reference into their leases. CP at 207. Residents have obligations, set out in the house rules, to maintain the interior and exterior appearance of the buildings in which they reside. For example, SHA restricts the installation of locks on unit doors and restricts the use of certain adhesives and the weight of items residents can hang on unit interior walls. CP at 202, 204. Rule violations are treated as violations of the lease. The lease agreement does not specifically state whether residents' doors are included in the property leased to residents or not. Br. of SHA at 12.

¶4 SHA considered issuing a rule limiting the amount and type of material that could be posted on unit doors. CP at 172-75. The record indicates that residents have posted "signs," including artistic images, flags, and political messages. CP at 210-16. SHA claims that swastikas and nude images have appeared on residents' doors. SHA rejected the

---

[1] Under article I, section 5 of the Washington Constitution, "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Under the First Amendment to the United States Constitution, "Congress shall make no law . . . abridging the freedom of speech, or of the press." Neither party makes independent arguments based on the state constitution.

idea of a limited regulation as likely ineffective in reducing SHA's management burden and costs and resident disagreements. Br. of SHA at 9-10.

¶5 Instead, SHA issued house rule number 42 (the rule), at issue in this case. The rule bans all signs, flyers, placards, advertisements, "or similar material" from exterior walls, interior common area walls and doors, and the surface of unit doors that face the hall or outside. CP at 162. The rule does not address the posting of materials inside resident units, and it permits postings in designated areas with prior written approval.

¶6 The rule refers to SHA's desire that its buildings be indistinguishable from other neighborhood buildings. The rule states that indiscriminate posting created "a negative appearance which detrimentally affects residents of the building, residents of the surrounding community, and the public generally." In its briefing, SHA expands on this explanation, stating that some displays had been creating hostility among residents, which SHA managers were called upon to mediate. It also claims that it incurs significant costs in refinishing doors damaged by postings. Br. of SHA at 9.

¶7 The RAC, a nonprofit organization composed of elected tenant representatives from LIPH communities, sued after SHA refused to withdraw or modify the rule. RAC claimed that the rule violated residents' rights of free speech guaranteed by the United States and Washington Constitutions. CP at 1-12. RAC moved for summary judgment, seeking an order declaring the rule unconstitutional and enjoining SHA from enforcing it. CP at 139.

¶8 The superior court found that the signs and materials posted on exterior surfaces of residential doors are "residential signs" and hence constitutionally-protected speech under the First Amendment to the United States Constitution and entitled to heightened judicial scrutiny, applying the reasoning of *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994). The superior court found that residents could, but did not, cede their control over

exterior surfaces of unit doors to SHA or designate those surfaces as "common areas." Finally, the superior court held that the SHA's cited interests were not sufficiently compelling to justify the regulation. The superior court permanently enjoined SHA from enforcing the rule in any way that infringed on tenants' rights to use their doors for expressive purposes. CP at 222-25. We accepted certification from the Court of Appeals.

## ANALYSIS

■ ■ ¶9 The superior court found for RAC on RAC's motion for summary judgment and enjoined enforcement of the rule. We review issues of law involving a constitutional challenge de novo, and the State bears the burden of justifying a restriction on speech. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 114, 937 P.2d 154, 943 P.2d 1358 (1997).

¶10 The first issue we need to decide is, under the facts of this case, who has "control" or "ownership" of the exterior of the door. This determination is critical to deciding what analysis to apply. If SHA retains "ownership" of the door, SHA argues this would mean that a nonpublic forum analysis would apply, under which limitations on expressive conduct are reviewed more leniently. RAC argues that the doors are included in the leased premises and, as such, become the property of the tenant during the term of the lease. Under its argument, a government ban on all residential signs constitutes a violation of the First Amendment.

■ ¶11 Generally, a lease is a conveyance of a limited estate for a limited term with conditions attached. Under Washington law, as a general rule, areas that are necessary to a tenant's use of the premises, and are for the exclusive use of the tenant and tenant's invitees, pass as an appurtenant to the leased premises though not specifically mentioned or described therein. *Andrews v. McCutcheon*, 17 Wn.2d 340, 344-45, 135 P.2d 459 (1943).

¶12 The issue in *McCutcheon* was whether McCutcheon, the landlord, had a duty to maintain a stairway. Patrons of the salon above McCutcheon's store had to walk through McCutcheon's store and then use an outside stairway at the store's rear to reach the salon. A salon patron, Andrews, was injured descending the stairway. McCutcheon argued that he had no duty to maintain the stairs. He contended that when he leased the balcony above his store, the stairway also passed as an appurtenant thereto.

¶13 The court stated that a basic right of ingress and egress through McCutcheon's store would assumptively be covered by the lease. The salon owner's exclusive use of the stairway, in contrast, entailed a greater right of control than that resulting from the tenants' and customers' need to pass through the store:

> It is a general rule of law that, when premises are leased, a stairway necessary to be used with them, and which is intended shall be for the exclusive use of the tenant and his invitees, passes as an appurtenant to the leased premises and is covered by the lease, though not specifically mentioned or described therein; but, when premises are leased to several tenants and it is necessary, in the enjoyment thereof, that they use a common stairway and no mention is made of it when the lease is made, it is not deemed to be appurtenant to the leased premises and covered by the lease, but the tenants and their invitees have the right to use the same as a means of access to the leased property.

*McCutcheon*, 17 Wn.2d at 344-45. Under this rule, because the stairway was used exclusively by the tenant and his invitees, the salon owner would receive more than a mere right to use the stairway for access.

¶14 *McCutcheon* involved control over a stairway, but its reasoning applies with equal force here. A tenant's authority over his or her unit door is greater than that necessary for mere ingress or egress. When a door is necessary to a tenant's use of the premises, and is for the exclusive use of the tenant and the tenant's invitees, it passes as an appurtenant to the leased premises and is part

of the leased premises. Put simply, the door that opens to the tenancy passes to the tenant unless the lease provides otherwise.

¶15 This same reasoning would apply if the leased premises involved a single family residence. The general rule is that the tenant receives the right to possess and use the house, the yard, and everything else necessary to the use of the leased premises. An apartment lease operates on the same principle as does a lease of a single family residence.

¶16 SHA argues that the "general rule" stated in *McCutcheon* should not apply here because SHA retained control over the doors. In *McCutcheon* the plaintiff argued that McCutcheon was liable, notwithstanding the general rule, because through McCutcheon's actions he expressly and impliedly indicated intent to retain control over the stairway. The court agreed; rather than passing as appurtenant to the leased premises, the court found that Mc-Cutcheon retained ownership and control over the stairs.

¶17 The facts here do not establish a reservation of control. Unlike SHA hallways and other such common areas, other tenants and the general public have no right of access to the outer surface of unit doors. *Cf. de la O v. Hous. Auth.*, 417 F.3d 495 (5th Cir. 2005) (finding the common areas of public housing facilities are public property and nonpublic forums). Nor does a landlord's control over a hallway, in itself, signal the landlord's intent to reserve control over an adjoining surface that is not common. It is not significant to this inquiry that the door, when closed, serves as part of the hallway. To the extent that a resident's use of his or her door does not interfere with use of the common area, the landlord's control over the common area does not imply a reservation of control over the adjacent door.

¶18 Nor would SHA impliedly retain control despite its responsibility for repair and replacement and liability for defective doors. Br. of SHA at 13-14. SHA has a duty to

maintain doors under the Residential Landlord-Tenant Act of 1973 and local codes. *See* RCW 59.18.060; Seattle Municipal Code 22.206.120, .140. SHA has a duty to maintain that is a function of statutory responsibilities, so maintenance is not tantamount to asserting a right of control. For these reasons, we find that SHA residents have, and retained, control and dominion over the outer surfaces of their doors.

¶19 In light of tenant control over their respective unit doors, RAC argues that *Gilleo* is directly on point. We agree with the tenants that the analysis in *Gilleo* controls the issue presented here.

¶20 In *Gilleo*, Margaret Gilleo sued the city of Ladue, alleging that Ladue's sign ordinance violated her First Amendment rights. That ordinance barred Ladue residents, like Gilleo, from erecting a wide variety of signs on their property " 'wherever placed out of doors in view of the general public or . . . as a window sign.' " 512 U.S. at 46 n.5 (quoting App. to Pet. for Cert. at 39a). The ordinance exempted, among others, for sale signs and on-site commercial and organizational signs.

¶21 The United States Supreme Court stated that a prohibition is not always invalid merely because it applies to a sizeable category of speech. For example, a ban on signs on public property poses a lesser threat to the ability to communicate effectively because the category of speech banned is not a uniquely valuable or important mode of communication. In contrast, residential signs are a means of communication that is "venerable . . . unique and important." 512 U.S. at 54. Residential signs "reflect and animate change in the life of a community." 512 U.S. at 54.

¶22 The Court cited unique facets of this medium. The medium is inexpensive and convenient. Residential signs reach neighbors, an audience "that could not be reached nearly as well by other means." 512 U.S. at 57. Further, residential signs have great value derived from their clear association with an identified speaker. "Displaying a sign from one's own residence often carries a message quite

distinct from placing the same sign someplace else . . . ." 512 U.S. at 56. In addition, the Court referred to the special respect for individual liberty in the home, a "principle [that] has special resonance when the government seeks to constrain a person's ability to *speak* there." 512 U.S. at 58. In response to the argument that the ordinance was merely a time, place, or manner restriction, the Court again emphasized the unique medium in question. It said it was not persuaded that adequate substitutes exist. The Court concluded that the provision prohibited "too much" speech. 512 U.S. at 50-51.

¶23 Like the ordinance in *Gilleo*, the SHA rule bans too much speech. The signs in this case may reflect reactions to local events or signal support or opposition to political candidates or laws. They do so in a manner that is inexpensive. Of particular importance here, the signs are unique because "[d]isplaying a sign from one's own residence carries a message quite distinct from placing the same sign someplace else" or by other means. 512 U.S. at 56. The identity of the resident is an "important component" of this means of communication. 512 U.S. at 56.

¶24 SHA has failed to meet its burden of justifying a restriction on speech. In reaching this conclusion, we consider first SHA's asserted interest in avoiding the cost of refinishing doors damaged by residents' signs. CP at 199. SHA already restricts the installation of locks on unit doors and limits the weight of items residents can hang on interior walls. CP at 202, 204. SHA could impose restrictions that would prevent damage to its doors by requiring the use of nondamaging materials. A total ban on signs is unnecessary to support the claimed interest.

¶25 Regarding SHA's asserted interest in reducing clutter, "while aesthetic interests are legitimate goals, they require careful scrutiny when weighed against free speech interests because their subjective nature creates a high risk of impermissible speech restrictions." *Collier v. City of Tacoma*, 121 Wn.2d 737, 752, 854 P.2d 1046 (1993) (finding Tacoma's interests in aesthetics and traffic safety sufficient

to justify reasonable content-neutral regulation of *noncommunicative aspects* like size and spacing).

¶26 Aesthetic concerns may merit some type of regulation here. SHA residents do not own their living spaces, and some residents may act based on what they feel is a reduced incentive to maintain property values. *Cf. Gilleo*, 512 U.S. at 58 (Ladue residents had a strong incentive to keep their own property values up and to prevent visual clutter, "incentives markedly different from those of persons who erect signs on others' land."). However, "more temperate measures," *Gilleo*, 512 U.S. at 58, are available to SHA in addressing this interest, including some limit on noncommunicative aspects of the signs. The same is true of SHA's interest in avoiding conflict between residents. While a ban is an inexpensive solution, other measures could achieve this interest without foreclosing the medium altogether. We find that SHA has not met its burden of justifying the restriction on speech.

¶27 An obvious purpose of the unit doors is to permit egress and ingress. However, that purpose is neither incompatible with expressive activity nor the sole purpose of this property. LIPH buildings provide a community for SHA residents, with all that that entails. Here, each unit door passed as appurtenant to the leased premises. In the eyes and minds of tenants and the public, the outer surface of the door represents the outer boundary of the tenants' homes. A ban on signs placed there is subject to the same scrutiny applied to the ordinance in *Gilleo*. *Cf. Spence v. Washington*, 418 U.S. 405, 408, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (statute forbidding the attachment of symbols to United States flag unconstitutional as applied; among "important" factors was that display occurred on private property).

¶28 It does not matter that SHA tenants lease and do not own the unit. *Gilleo* makes no distinctions between privately-owned residences and publicly-owned surfaces leased as part of a residence to a private tenant. A sign placed on a unit door by the resident under these circumstances is a

residential sign. We find *Gilleo*'s analysis persuasive and conclude that the rule violates the First Amendment rights of LIPH tenants. We affirm the decision of the trial court.

ALEXANDER, C.J.; SANDERS and OWENS, JJ.; and BRIDGEWATER, J. PRO TEM., concur.

¶29 MADSEN, J. (dissenting) — The issue here is the constitutionality of rule 42, adopted by the Seattle Housing Authority (Housing Authority) to protect its tenants and its property. The Housing Authority, " 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) (internal quotation marks omitted) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129-30, 101 S. Ct. 2676, 69 L. Ed. 2d 517 (1981)).

¶30 The majority reaches the wrong result and strikes down rule 42 because it fails to engage in the forum analysis that should be applied when a question arises concerning access to government property for expressive purposes. In addition, the majority overlooks precedent dictating that the exterior of the doors leading to the tenants' apartment units are within the control of the landlord, not the tenant. Indeed, contrary to the majority's assertion, the Housing Authority has expressly retained control of the apartment doors abutting the common areas. The majority also concludes that *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) controls. But *Gilleo* simply does not apply under the circumstances because when the Housing Authority adopted rule 42, it did so in a proprietary sense as the landlord of its apartment buildings, not as a governmental entity in the exercise of its police power. I dissent.

## ANALYSIS

### 1. Housing Authority Property Is a Nonpublic Forum

¶31 The Housing Authority's apartment buildings are public property. Accordingly, the standard that applies to evaluate limitations on access to the premises for purposes of expressive activity depends on the character of the property. *Perry*, 460 U.S. at 45. In cases where individuals have claimed violation of free speech rights resulting from restrictions imposed by a public housing authority, courts have employed a forum analysis to determine what standard of review applies to assess the constitutionality of the challenged restrictions. *de la O v. Hous. Auth.*, 417 F.3d 495 (5th Cir. 2005); *Daniel v. City of Tampa*, 38 F.3d 546 (11th Cir. 1994); *Crowder v. Hous. Auth.*, 990 F.2d 586 (11th Cir. 1993); *Daily v. N.Y. City Hous. Auth.*, 221 F. Supp. 2d 390 (E.D.N.Y. 2002).

¶32 There are three categories of public property: traditional public forums, property designated as public forums, and nonpublic forums. Public forums are places that " 'by long tradition or by government fiat have been devoted to assembly and debate.' " *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985) (quoting *Perry*, 460 U.S. at 45); *de la O*, 417 F.3d at 502-03; *Daniel*, 38 F.3d at 549. A designated public forum is property that has been opened by the government for the use of the public as a place for expressive activity, such as a municipal theater or a university meeting hall. *Cornelius*, 473 U.S. at 802; *see Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975); *Widmar v. Vincent*, 454 U.S. 263, 267, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981); *de la O*, 417 F.3d at 503; *Daniel*, 38 F.3d at 549.

¶33 Here, the Housing Authority property is neither a public forum nor a designated public forum. Doors to individual apartment units in apartment buildings have not traditionally been open to the public for expressive pur-

poses, nor does the public generally have access to apartment buildings for such purposes. Indeed, the doors are generally seen only by residents and their invited guests.

¶34 Further, the Housing Authority has not designated the doors as a place for expressive activity. In *Crowder*, by way of comparison, a public housing authority opened an auditorium to expressive activities, including classes, political speeches, and religious services, and the court held that the auditorium was a designated public forum for limited purposes. *Crowder*, 990 F.2d at 590-91.

¶35 The apartment buildings at issue fall within the third category of property, nonpublic forums. A nonpublic forum is property that is not by tradition or designation a forum for public communication. *Perry*, 460 U.S. at 46. This "sweeping category" of property encompasses many types of property, including jails, military bases, and interstate highway rest stops. *de la O*, 417 F.3d at 503. With respect to such property, the United States Supreme Court has repeatedly explained that the " 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' " *Perry*, 460 U.S. at 46 (quoting *U.S. Postal Serv.*, 453 U.S. at 129). " '[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Id.* (internal quotation marks omitted) (quoting *U.S. Postal Serv.*, 453 U.S. at 129-30). "[T]he government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992). Accordingly, the government may reserve a nonpublic forum for its intended purposes, whether communicative or not, and impose regulations on speech provided they are reasonable and content-neutral. *Id.* Time, place, and manner restrictions may also be imposed.

¶36 Public housing facilities have been held to be nonpublic forums. For example, where residents did not

regularly or frequently meet for expressive purposes in the library of a public housing development, it was a nonpublic forum. *Crowder*, 990 F.2d at 591. A community center at a housing project was a nonpublic forum by default, and a limited public forum only at times other than during the regularly scheduled educational activities. *Daily*, 221 F. Supp. 2d at 399-400.

¶37 Under article I, section 5 of the state constitution, the same analysis applies to a nonpublic forum as applies under the First Amendment to a nonpublic forum. *City of Seattle v. Mighty Movers, Inc.*, 152 Wn.2d 343, 350-51, 96 P.3d 979 (2004). Thus, speech may be restricted if distinctions drawn are reasonable in light of the forum's purpose and are viewpoint neutral. *Id.* at 351. This analysis applies here.

¶38 Because rule 42 forbids all expressive activity on doors, it is content-neutral. It is also a reasonable restriction on access to the doors for expressive purposes in light of the purpose of the apartment buildings to provide decent, safe, sanitary public housing for low income people. As the Housing Authority explains, part of the commitment to quality low-income housing is an effort to maintain the appearance of both the interior and exterior of the properties and require residents to meet obligations for maintaining the interior and exterior of the buildings in which they live. To this end, the Housing Authority has implemented a number of house rules, included as an addendum to the lease, that require residents to maintain the premises.

¶39 Signs and displays on doors became a particular concern for management. Residents complained about the "cluttered," "college dormitory" appearance of hall corridors where things are attached to doors. Specific items that have been placed on doors have generated strong reactions from residents. These have included swastikas, nude pictures and photographs, religious symbols, and profane language. Such door displays created hostility between residents and resulted in serious management problems for property

managers. In addition, costs of refinishing decorated doors have been a significant expense for the Housing Authority.

¶40 The Housing Authority initially considered restrictions less than a complete ban on placing things on doors but eventually concluded this was not a satisfactory solution. The Housing Authority decided that content-based restrictions would be legally questionable and difficult if not impossible to administer. Simply regulating the size of signs would also pose a significant burden on management, because it would involve keeping track of literally hundreds of doors and the signs placed on them. And in any event, size restrictions would not resolve the problem of offensive messages and would not eliminate the need for refinishing doors damaged when messages were placed on them.

¶41 These reasons for adopting a complete ban on signage and decorations on the exterior sides of the doors leading to individual apartment units are reasonable in light of the purposes of the apartment buildings and the doors.

¶42 Contrary to the majority's approach, under well-settled precedent this court should apply a forum analysis to determine the standard to apply in assessing the constitutionality of rule 42. Under this analysis, the rule is constitutional under the First Amendment and article I, section 5.

2. The Housing Authority as Landlord Retained Control over the Apartment Doors

¶43 The majority refuses to follow the forum analysis because it says that the tenant, rather than the landlord, controls the exterior of the door leading into the individual apartment unit. The majority relies on authority addressing whether a landlord had a duty to maintain a stairway, *Andrews v. McCutcheon*, 17 Wn.2d 340, 135 P.2d 459 (1943), and concludes that the doors are appurtenant to the rented premises. I am not convinced that landlord-tenant cases resolve the question, but in any event the majority's con-

clusion is not supported by precedent on landlord-tenant law in this state.

¶44 "A landlord has a duty to maintain, control and preserve retained portions of the premises subject to a leasehold in a manner rendering the demised premises adequate for the tenant's use and safe for occupancy by both the tenant and his invitees." *Cherberg v. Peoples Nat'l Bank of Wash.*, 88 Wn.2d 595, 601, 564 P.2d 1137 (1977). The Housing Authority retained ownership and control over the doors. Rule 16 requires all apartment entry doors to remain closed except when in use in order to maintain the fire rating of the apartment building and to ensure the privacy and security of all residents. Thus, the lease agreements between tenants and the Housing Authority expressly provide that the Housing Authority as landlord reserved control over the doors. It therefore has a duty to maintain and control these areas so that they are adequate for the tenants' use and safety. If the Housing Authority fails to maintain a resident's door, any resulting threat to a tenant's safety would "constitute an actionable constructive eviction." *Cherberg*, 88 Wn.2d at 601.

¶45 In addition, a landlord is presumed to retain control over all common areas of its leased premises and is responsible for maintaining these areas. *Leuch v. Dessert*, 137 Wash. 293, 295, 242 P. 14 (1926). Common areas include "common passageways." *McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 445, 486 P.2d 1093 (1971). Apartment doors constitute an integral part of corridors in the apartment buildings and thus are an integral part of the common passageways, i.e., common areas. The Housing Authority concedes that it is fully responsible for repair and replacement of damaged apartment doors and is liable for injuries that result from defective doors. Thus, if a third party passing through the hall of one of the buildings kicked a resident's door in, the landlord would have to repair the door. If a door was defective and injured a person passing by in the hall, the landlord would be responsible, not the tenant. The landlord, i.e., the Housing Authority, would be responsible for repair as well.

¶46 Under our precedent, the doors are not within the tenants' control because the Housing Authority as landlord expressly retained its interest in the doors to the apartments within the buildings and also because the exteriors of the doors constitute part of the common area.[2] The majority's assessment of state landlord-tenant law is unfortunately incomplete and erroneous. The court should hold that the landlord controls the exterior of the doors to the apartment units.

### 3. *City of Ladue v. Gilleo* Does Not Apply

¶47 Finally, the majority's conclusion that this case is controlled by *Gilleo* is wrong because *Gilleo* simply does not apply to these circumstances. *Gilleo* involved a challenge to a city ordinance that banned all residential signs except those falling within 10 specified exemptions. The primary reason for the ban was minimizing visual clutter. The plaintiff challenged the ordinance, claiming it violated her free speech rights because she was prevented from displaying a political message on her property.

¶48 The United States Supreme Court held that the ordinance violated the First Amendment. Central to its disposition was the fact that the ordinance, enacted in the exercise of the city's police power, banned speech on private residential property. The Court first observed that although signs are a form of expression, "they pose distinctive problems that are *subject to municipalities' police powers."* *Gilleo*, 512 U.S. at 48 (emphasis added). Signs can be legitimately regulated because they "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems." *Id*. But the ordinance at

---

[2] The out of state authority relied on by the Resident Action Council in fact supports this conclusion. In *Nyer v. Munoz-Mendoza*, 385 Mass. 184, 430 N.E.2d 1214 (1982), the court held that a tenant who rented a three bedroom apartment consisting of two stories had control of the door to the tenant's apartment and was entitled to place a sign there. However, the court expressly distinguished situations where a "letting of 'rooms' " was at issue and situations where the use to which the exterior of a door is put interferes with or precludes use by the landlord and other tenants of common areas. *Id*. at 187 n.5, 188 n.7.

issue "almost completely foreclosed a venerable means of communication that is both unique and important . . . residential signs." *Id.* at 54-55. The Court explained that "[a] special respect for individual liberty in the home has long been part of our culture and our law." *Id.* at 58. The Court explained that it had upheld an ordinance prohibiting the placement of signs on *public* property in *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984), but rejected the argument that the city's asserted interest in aesthetics had been compromised because the city did not forbid signs on *private property*. *Gilleo*, 512 U.S. at 50. The Court emphasized the " *'private citizen's interest in controlling the use of his own property.'* " *Id.* (emphasis added) (quoting *Vincent*, 466 U.S. at 811).

¶49 The Court held the ban violated the First Amendment. In doing so, the Court said that "[i]t bears mentioning that individual residents themselves have strong incentives to keep their own property values up and to prevent 'visual clutter' in their own yards and neighborhoods—incentives markedly different from those of persons who erect signs on others' land . . . or on public property." *Id.* at 58.

¶50 In the present case, in marked contrast, no government entity has enacted in the exercise of its police power any ordinance or regulation that applies within its governmental jurisdiction. The Housing Authority adopted rule 42 as a landlord, to apply to its rental property—a nonpublic forum. As explained above, and it bears repeating, " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Perry*, 460 U.S. at 46 (alteration in original) (internal quotation marks omitted) (quoting *U.S. Postal Serv.*, 453 U.S. at 129-30); *see de la O*, 417 F.3d at 505 (distinguishing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002), where the Court invalidated an ordinance that required requesting a permit before engaging in door-to-door activities, on the ground

that there the ordinance at stake applied to the entire municipality and was not limited to nonpublic forums such as the public housing facilities in *de la O*).

¶51 The United States Supreme Court has recognized the difference between government regulations passed and enforced by a government entity in the capacity of sovereign and acts taken by the government in the capacity of the landlord of property it owns and controls. In *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125, 122 S. Ct. 1230, 152 L. Ed. 2d 258 (2002), tenants challenged a provision of the Anti-Drug Abuse Act of 1988, 42 U.S.C. § 1437d(*l*)(6), that authorized eviction of tenants from public housing developments on the basis of drug-related criminal activity engaged in by the tenants' household members, guests, or other persons, regardless of whether the tenants knew of the activity. The Court rejected claims of deprivation of property rights and violation of due process, and in doing so distinguished between cases where the government acted as sovereign and cases where the government is not attempting to criminally punish or civilly regulate individuals as members of the general populace, but is instead acting as the landlord of property that it owns. *Rucker*, 535 U.S. at 135.

¶52 Here, the apartment buildings are owned and controlled by the Housing Authority; the apartment units are not the private property of the residents. This is a critical distinction, as a simple example shows. If a private owner imposed a restriction like rule 42 on its apartment complexes rented to tenants, there would be no merit to an argument that the restriction is unconstitutional under the First Amendment because the apartment units are the tenants' residences. There would be no state action. Thus, it is clear that it is not merely the nature of the property as a residence that controls, but other factors must be considered as well. In *Gilleo*, the property involved was the challenger's *own private* property. Here, the property is public property. In *Gilleo*, the ordinance was enacted by the city to apply to the general populace. Here, the Housing

Authority is not attempting to criminally punish or civilly regulate but instead adopted rule 42 as a landlord attempting to manage its property and avoid signs and decorations on doors that are offensive to tenants, are unattractive, and cause damage to the doors. In *Gilleo* the property owners had strong incentives to keep their own property values up and prevent visual clutter in their own yards.

¶53 The majority is wrong in concluding that the holding in *Gilleo* applies any time that a residence is involved. The Court simply did not address in *Gilleo* the question of whether the First Amendment would be offended by a sign restriction applying to public property owned and managed by a public housing authority acting as the owner-landlord. Nor did the Court say or imply that any and all residences would come within its holding. Moreover, in other cases the Court has not applied a blanket First Amendment protection to activity within apartments in a public housing development. *See Rucker*, 535 U.S. at 136 n.6 (rejecting tenants' First Amendment freedom of association claim).

¶54 The United States Supreme Court has also made it clear that the financial circumstances of the tenants, as low income persons entitled to public housing assistance, do not require that a different constitutional standard be applied here than would apply if wealthy individuals renting upscale penthouse apartments in a privately owned apartment building had to comply with a rule prohibiting signs on their doors. In *Lyng v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW*, 485 U.S. 360, 180 S. Ct. 1184, 99 L. Ed. 2d 380 (1988), the Court addressed claims arising from a provision in the Food Stamp Act, 7 U.S.C. § 2015(d)(3), that precluded households from becoming eligible for food stamps if a member of the household was on strike, and also prohibited an increase in the food stamp allotment for a household if household income was decreased as a result of a member being on strike. Strikers argued that the law violated their First Amendment associational rights because it made it harder for strikers to maintain themselves

and their families and exerted pressure on them to abandon their union.

¶55 The Court recognized that the strikers would be better off if food stamps were available, but the right of association "does not require the Government to furnish funds to maximize the exercise of that right." *Lyng*, 485 U.S. at 368. The Court observed that it had held in several contexts " 'that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.' " *Id.* (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983)). The Court then turned to the strikers' claim that the law abridged their right to express themselves about union matters free of government coercion. The Court said that the law

> requires no exaction from any individual; it does not "coerce" belief; and it does not require appellees to participate in political activities or support political views with which they disagree. It merely declines to extend additional food stamp assistance to striking individuals simply because the decision to strike inevitably leads to a decline in their income.

*Id.* at 369.

¶56 Most significantly, for purposes of this case, the Court then said: "[E]ven where the Constitution prohibits coercive governmental interference with specific individual rights, it ' "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." ' " *Id.* (quoting *Regan*, 461 U.S. at 550 (quoting *Harris v. McRae*, 448 U.S. 297, 318, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980))). Thus, while a tenant in low income public housing does not have the financial ability to own a private residence, to which the rule of *Gilleo* might be applied, that does not mean that constitutional principles must be altered to permit expressive activity where it would not be required if the tenants were wealthy individuals choosing to live in leased premises.

¶57 Finally, while there is undoubtedly concern about tenants being able to express their views, it is also impor-

tant to remember that there are neighbors with rights as well. The First Amendment does not require others "to listen to or view any unwanted communication, whatever its merit." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 737, 90 S. Ct. 1484, 25 L. Ed. 2d 736 (1970). And where that message is offensive, as a swastika, pornography, or profanity is to many individuals, the rights of the neighbors who must live in Housing Authority property should not be ignored.

## CONCLUSION

¶58 A forum analysis is necessary to determine the standard that applies to assess the constitutionality of rule 42, which the Housing Authority adopted and which bans all signs and decorations on the exterior side of doors to individual apartment units. Under this analysis, the doors are a nonpublic forum and rule 42 does not violate the First Amendment or article I, section 5 because it is content-neutral and reasonable in light of the purpose of the public housing apartments and doors. The majority erroneously concludes that the doors are in the control of the tenants and erroneously applies case law that pertains to ordinances affecting privately owned property, not rules adopted by the government in its capacity as the landlord of public housing.

CHAMBERS, FAIRHURST, and J.M. JOHNSON, JJ., concur with MADSEN, J.