**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| FILIBERTO MORA, | ) | No. 81477-0-I |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRISTY MACGILVARY and JOHN | ) | |
| DOE MACGILVARY and the marital | ) | |
| Community thereof, | ) | |
| | ) | |
| Respondents, | ) | DIVISION ONE |
| | ) | |
| TRUDEL LLC, a Washington limited | ) | |
| liability company; Wayne Seminoff | ) | |
| individually and as an agent of | ) | |
| TRUDEL LLC; Lisa Seminoff, | ) | |
| Individually and as sole owner of | ) | |
| TRUDEL LLC, | ) | |
| | ) | PUBLISHED OPINION |
| Petitioners. | ) | |
| | ) | |

MANN, C.J. — The Distressed Property Conveyances Act, ch. 61.34 RCW, (DPCA) is a remedial statute enacted to protect vulnerable homeowners from equity skimming and other fraudulent and predatory schemes. After a subsequent purchaser sued Christy MacGilvary to quiet title to her home, MacGilvary filed a cross claim against Trudel, LLC, Wayne Seminoff, and Lisa Seminoff (collectively "Trudel") claiming that their purchase of her home violated the DPCA and Consumer Protection Act, ch.

19.86 RCW (CPA). Trudel appeals the trial court's order denying their motion for summary judgment, and granting summary judgment for MacGilvary. Trudel argues that: (1) the DPCA does not apply; (2) Trudel did not act in bad faith; (3) because Trudel did not violate the DPCA, it did not violate the CPA; and (4) Wayne and Lisa Seminoff should not be held jointly and severally liable for actions that they took on behalf of Trudel, LLC. Because Trudel's actions purchasing MacGilvary's home are the precise types of behavior that the DPCA is intended to prohibit, we affirm that the statute applies, Trudel acted in bad faith, and Trudel violated both the DPCA and CPA. Because the application of joint and several liability raises an issue of material fact not amenable to summary judgment, we reverse. In light of these holdings, we remand for determination of damages, as well as possible joint and several liability.

## FACTS

In December 2015, because of nearly seven years of unpaid property taxes, MacGilvary faced foreclosure on her home in Renton, Washington (the property). Three days before the foreclosure sale of the property, Wayne[1] Seminoff approached MacGilvary at her home, interested in purchasing the property. Wayne spoke to MacGilvary on behalf of Trudel, LLC, a company solely owned by his daughter, Lisa Seminoff.

In exchange for the property, Trudel offered to pay $15,000 to MacGilvary via cashier's check, $20,952.29 in unpaid taxes to King County, and $5,000 to release a credit card lien against the property. Trudel also offered to allow MacGilvary to remain

---

[1] This opinion refers to Wayne and Lisa Seminoff by their first names for clarity. We intend no disrespect.

on the property rent-free for 6 months, and for $600 per month thereafter.  To memorialize the agreement, Trudel left this note on a torn piece of paper:[2]



The next day MacGilvary went to Wayne's Lake Washington condominium to sign a quitclaim deed for her property and to collect a $15,000 cashier's check.

MacGilvary struggled to pay rent on the property.  On October 31, 2016, MacGilvary wrote to Wayne about a payment of $973.86 "to get rent paid [through] October."  She wrote: "I sold this place dirt cheap and so I'm hoping there's enough leeway for compromising.  I just can't afford to pay six hundred cash every month."

In December 2016, MacGilvary ceased paying rent.  Despite MacGilvary's lack of rent payments, Wayne continued to give her reassurance that she could stay in her home.  On June 29, 2017, MacGilvary provided a property identification number to

---

[2] Trudel reduced the cash payment to $15,000 because of the satisfaction of the $5,000 credit card lien.

Wayne at his request. In doing so, she stated: "Ya know this [wasn't] the deal we had, the deal was so I could live here. Not [for you to] sell it." Wayne responded: "I am not going to sell the mobile home to anyone it's going to be there for you to live in [f]orever this is just a paper transaction we have to do to make everybody happy at the title company."

On August 15, 2017, Trudel sold the property to Filiberto Mora for $120,000. MacGilvary continued to reside on the property, paying only water and electric bills.

On February 26, 2019, Mora filed a complaint to quiet title to the property. MacGilvary filed a cross claim alleging that Trudel violated the DPCA and CPA.[3]

On May 1, 2020, the trial court heard cross-motions for summary judgment. The court denied Trudel's motion for summary judgment, and granted MacGilvary summary judgment on her causes of action under the DPCA and CPA. In doing so, the court held that: (1) Wayne, Lisa, and Trudel, LLC were jointly and severally liable for violating the DPCA and CPA; (2) Trudel acted in bad faith; and (3) remedies for Trudel's violations under the DPCA and CPA could not be decided on the record before the court.

After unsuccessfully seeking reconsideration, Trudel moved for discretionary review under RAP 2.3(b)(4). We granted review.

ANALYSIS

A. Standard of Review

This court reviews summary judgment decisions de novo. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013). "Summary judgment is proper only where there is no genuine issue of material fact and

---

[3] Claims related to Mora are not at issue on appeal.

the moving party is entitled to judgment as a matter of law." Int'l Marine Underwriters, 179 Wn.2d at 281. The moving party has the initial burden of proving the absence of an issue of material fact. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). When the moving party is a defendant who meets this initial showing, then the inquiry shifts to the plaintiff. Young, 112 Wn.2d at 225. If the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the trial court should grant the motion for summary judgment. Young, 112 Wn.2d at 225.

On review, we must consider "the facts submitted and all reasonable inferences therefrom in the light most favorable to the nonmoving party." Chelan County Deputy Sheriffs' Ass'n v. Chelan County, 109 Wn.2d 282, 294, 745 P.2d 1 (1987). "Even where the evidentiary facts are undisputed, if reasonable minds could draw different conclusions from those facts, then summary judgment is not proper." Chelan County, 109 Wn.2d at 295. A trial court's findings of fact are superfluous in summary judgment proceedings and have no weight on appeal. Chelan County, 109 Wn.2d at 294 n.6. A court must apply the standard of proof that will apply at trial when ruling on a motion for summary judgment. Gossett v. Farmers Ins. Co. of Wash., 133 Wn.2d 954, 973, 948 P.2d 1264 (1997).

Statutory interpretation is a question of law reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.2d 4 (2002). The ultimate goal of interpretation is to determine and carry out the intent of the legislature. Campbell & Gwinn, 146 Wn.2d at 9. If possible, courts "must give effect to [the] plain meaning [of a statute] as an expression of legislative intent. Campbell & Gwinn, 146 Wn.2d at 9.

Courts derive plain meaning from the context of the entire act as well as any "related statutes which disclose legislative intent about the provision in question." Campbell & Gwinn, 146 Wn.2d at 11. If a statute is unambiguous, courts need not consider outside sources. State v. Delgado, 148 Wn.2d 723, 717, 63 P.3d 792 (2003).

A statute is ambiguous when, after examination, "it is subject to more than one reasonable interpretation." City of Seattle v. Winebrenner, 167 Wn.2d 451, 456, 219 P.2d 686 (2009). Once a statute is subject to more than one reasonable interpretation, courts "may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." Christensen v. Ellsworth, 162 Wn.2d 365, 373, 173 P.2d 228 (2007).

B. The DPCA

"The DPCA's protections are reserved for desperate circumstances that may induce homeowners into unscrupulous deals." Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.2d 1003 (2014). The DPCA is a remedial statute and "we construe remedial statutes liberally in accordance with the legislative purpose behind them." Jametsky, 179 Wn.2d at 763. The DPCA creates procedural safeguards for transactions protecting "distressed homes" or "distressed homeowners." See, e.g., RCW 61.34.050, .060, .070, .080; Jametsky, 179 Wn.2d at 762. Relevant here, a "distressed home" is defined to include a "dwelling that is in danger of foreclosure or at risk of loss due to nonpayment of taxes." RCW 61.34.020(2)(a). A "distressed homeowner," logically, "means an owner of a distressed home." RCW 61.34.020(7).

1. Application of the DPCA

Trudel first argues that the DPCA does not apply because the act requires evidence of "equity skimming" and MacGilvary failed to prove that equity skimming occurred. Because equity skimming is not required to prove a violation of the DPCA, we disagree.

To begin, we agree with Trudel that equity skimming[4] did not occur in its transaction with MacGilvary. See RCW 61.34.020(1). But the DPCA covers more than just the criminal act of equity skimming. As the Washington Supreme Court held in Jametsky: "The DPCA is a remedial statute that protects vulnerable homeowners from equity skimming and other fraudulent and predatory schemes." 179 Wn.2d at 764

---

[4] RCW 61.34.020(1) defines "equity skimming" as follows:
(1) An "act of equity skimming" occurs when:
(a)(i) A person purchases a dwelling with the representation that the purchaser will pay for the dwelling by assuming the obligation to make payments on existing mortgages, deeds of trust, or real estate contracts secured by and pertaining to the dwelling, or by representing that such obligation will be assumed; and
(ii) The person fails to make payments on such mortgages, deeds of trust, or real estate contracts as the payments become due, within two years subsequent to the purchase; and
(iii) The person diverts value from the dwelling by either (A) applying or authorizing the application of rents from the dwelling for the person's own benefit or use, or (B) obtaining anything of value from the sale or lease with option to purchase of the dwelling for the person's own benefit or use, or (C) removing or obtaining appliances, fixtures, furnishings, or parts of such dwellings or appurtenances for the person's own benefit or use without replacing the removed items with items of equal or greater value; or
(b)(i) The person purchases a dwelling in a transaction in which all or part of the purchase price is financed by the seller and is (A) secured by a lien which is inferior in priority or subordinated to a lien placed on the dwelling by the purchaser, or (B) secured by a lien on other real or personal property, or (C) without any security; and
(ii) The person obtains a superior priority loan which either (A) is secured by a lien on the dwelling which is superior in priority to the lien of the seller, but not including a bona fide assumption by the purchaser of a loan existing prior to the time of purchase, or (B) creating any lien or encumbrance on the dwelling when the seller does not hold a lien on the dwelling; and
(iii) The person fails to make payments or defaults on the superior priority loan within two years subsequent to the purchase; and
(iv) The person diverts value from the dwelling by applying or authorizing any part of the proceeds from such superior priority loan for the person's own benefit or use.

(emphasis added).  The DPCA makes equity skimming a class B felony, as well as establishes that "any violation of the DPCA is 'an unfair method of competition' for the purposes of the Consumer Protection Act."  Jametsky, 179 Wn.2d at 764; RCW 61.34.040(1).  The DPCA also provides that "courts may impose up to $100,000 in exemplary damages for bad faith violations of the DPCA."  Jametsky, 179 Wn.2d at 764-65; RCW 61.34.040(2).

Trudel bases its argument—that the DPCA applies only to acts of equity skimming—on the "legislative findings" in RCW 61.34.010:

> The legislature finds that persons are engaging in patterns of conduct which defraud innocent homeowners of their equity interest or other value in residential dwellings under the guise of a purchase of the owner's residence but which is in fact a device to convert the owner's equity interest or other value in the residence to an equity skimmer, who fails to make payments, diverts the equity or other value to the skimmer's benefit, and leaves the innocent homeowner with a resulting financial loss or debt.

> The legislature further finds this activity of equity skimming to be contrary to the public policy of this state and therefore establishes the crime of equity skimming to address this form of real estate fraud and abuse.

While Trudel is correct that the "findings" in RCW 61.34.010 address only equity skimming, declarations of intent are not controlling and do not trump the plain language of the statute.  Instead, "they serve only as an important guide in determining the intended effect of the operative sections."  State v. Reis, 183 Wn.2d 197, 211-214, 351 P.3d 127 (2015) (citing Killian v. Atkinson, 147 Wn.2d 16, 23, 50 P.3d 638 (2002)).  Here, as recognized by our Supreme Court in Jametsky, the plain language of the DPCA applies to more than just equity skimming.

Moreover, while not addressed by the Supreme Court in Jametsky, its conclusion that the DPCA covers more than equity skimming is supported by the legislative history

of the statute. RCW 61.34.010 was enacted in 1988 as section 1 of S.S.B. 6096, which created chapter 61.34 and the new class B felony of equity skimming. Chapter 33, LAWS OF 1988. Twenty years later, during the financial crisis of 2008, the legislature amended chapter 61.34 RCW by enacting H.B. 2791, "AN ACT Relating to distressed property conveyances." LAWS OF 2008, ch. 278. H.B. 2791 created new definitions, including definitions for "distressed homes," "distressed home conveyances," and "distressed home purchasers." LAWS OF 2008, ch. 278, § 1. H.B. 2791 also created the procedural requirement for distressed home conveyances and made violations of the act a per se violation of the CPA. LAWS OF 2008, ch. 278. While the legislature did not amend the findings in RCW 61.24.010, its application to the new provisions added to chapter 61.34 RCW in 2008 is of minimal, if any, value. See Reis, 183 Wn.2d at 211-14 (statement of legislative intent is of little value where key provisions of enactment were vetoed by the Governor).[5]

Because the DPCA applies to more than equity skimming, provisions of the DPCA may apply if MacGilvary is a distressed homeowner in possession of a distressed home. Here, it is uncontested that MacGilvary was a distressed homeowner, that her Renton property was a distressed home, and that her property was three days from foreclosure for nonpayment of taxes when Trudel approached with an offer to purchase.

---

[5] Amicus Curiae Attorney General of Washington correctly notes that the House Bill report for H.B. 2791 further supports that the 2008 amendments recognize the need to protect distressed homeowners from foreclosure rescue scams. H.B. REP. ON H.B. 2791, at 5, 60th Leg., Reg. Sess. (Wash. 2008). Because the DPCA is not ambiguous, and its intent to cover more than just equity skimming flows from the plain language and related enactments, we need not consider the legislative bill report. Campbell & Gwinn, 146 Wn.2d at 9-11.

2. <u>Distressed Home Consultant</u>

Trudel argues that it did not act as a "distressed home consultant" under RCW 61.34.020(3). We disagree.

RCW 61.34.020(3) defines a "distressed home consultant" as a person who:

(a) Solicits or contacts a distressed homeowner in writing, in person, or through any electronic or telecommunications medium and makes a representation or offer to perform any service that the person represents will:

> (i) Stop, enjoin, delay, void, set aside, annul, stay, or postpone a foreclosure sale;
>    . . . .
>
> (vii) Save a distressed homeowner's residence from foreclosure;
>    . . . .
>
> (ix) Cause a contract to purchase an interest in the distressed home to be executed or closed within twenty days of an advertised or docketed foreclosure sale, unless the distressed homeowner is represented in the transaction by an attorney or a person licensed under chapter 18.85 RCW;
>
> (x) Arrange for the distressed homeowner to become a lessee or tenant entitled to continue to reside in the distressed homeowner's residence, unless (A) the continued residence is for a period of no more than twenty days after closing, (B) the purpose of the continued residence is to arrange for and relocate to a new residence, and (C) the distressed homeowner is represented in the transaction by an attorney or a person licensed and subject to chapter 18.85 RCW; . . . or

(b) Systematically contacts owners of property that court records, newspaper advertisements, or any other source demonstrate are in foreclosure or are in danger of foreclosure.

Trudel asserts that it did not act as a distressed home consultant because it did not "perform a service" for MacGilvary. Rather, Trudel contends, it merely acted as a purchaser of MacGilvary's property. Trudel further claims that it did not act as a

distressed home consultant because it did not systemically contact owners whose properties were in danger of foreclosure. Trudel is incorrect.

Trudel does not characterize its actions with MacGilvary as providing one of the 12 services enumerated in RCW 61.34.020(a), but rather Trudel was simply making a purchase. This argument is disingenuous. Trudel's actions stopped the foreclosure sale of MacGilvary's property, saved the property from foreclosure, caused a contract to purchase the property within 20 days of the foreclosure, and arranged for MacGilvary to live on the property after Trudel's purchase. See RCW 61.34.020(a)(i), (vii), (ix), (x). Even were we to narrowly interpret the DPCA, which we do not, its plain language proves that Trudel acted as a distressed home consultant per RCW 61.34.020(a).

Trudel also claims that it did not systematically contact distressed homeowners, but the record reflects differently. Lisa testified that she and Wayne would obtain a list of foreclosed properties to inspect prior to their foreclosure auctions. She would then knock on the doors to the properties and ask the owners if they were aware of their foreclosure status. Afterward, Lisa would tell them that she was thinking of purchasing the property, and ask what condition the property was in. Construing RCW 61.34.020(b) in favor of the consumer, Lisa and Wayne's actions demonstrate that they systematically contacted owners of properties in danger of foreclosure, thus acting as distressed home consultants per RCW 61.34.020(b).

Because Trudel qualifies as distressed home consultants under both the provisions of RCW 61.34.020(a)(i), (vii), (ix), (x), and RCW 61.34.020(b), it was subject to the procedural requirements of the DPCA.

RCW 61.34.050 and RCW 61.34.060 govern the duties of a distressed home consultant. RCW 61.23.050 contains notice requirements, while RCW 61.34.060 creates a fiduciary relationship between the distressed home consultant and the distressed homeowner. The notice requirements of RCW 61.34.050 require, in part, that a distressed home consulting transaction must: (1) be in writing; (2) be in the same language as mainly used by the distressed home consultant to describe his or her services to the distressed homeowner; (3) fully disclose the exact nature of the distressed home consulting services to be provided, including any distressed home conveyance that may be involved; (4) be dated and signed by the distressed homeowner and the distressed home consultant; (5) contain certain pieces of identifying information of the distressed home consultant, and, if the distressed home consultant is serving as an agent, the identifying information of the principal; and (6) include a statutorily provided notice provision alerting the distressed homeowner that he or she may lose their home. RCW 61.34.050(1)(a)-(f). The distressed home consultant must provide the distressed homeowner with a copy of the agreement and keep a separate copy on file for at least five years. RCW 61.34.050(2).

The distressed home consultant is subject to all requirements applicable to fiduciaries under Washington law. RCW 61.34.060. In addition, the distressed home consultant must: (1) act in the distressed homeowner's best interest and in utmost good faith, not compromising the distressed homeowner's right or interest in favor of another, including the distressed home consultant; (2) disclose to the distressed homeowner all material facts that might affect the distressed homeowner's rights; (3) use reasonable

care; and (4) provide accounting for all money and property received from the distressed homeowner.

The record shows that Trudel violated nearly every provision of RCW 61.34.050 and .060. The sole written records of the purchase of MacGilvary's property are scribbles on a torn piece of notebook paper and a signed quitclaim deed. These documents fail to satisfy the formatting, disclosure, signature, information, notice, and copy requirements of RCW 61.34.050.

Additionally, Trudel's actions fall far from those of a fiduciary. Trudel acted in its own interest, purchasing the property from MacGilvary and later selling it at nearly 300 percent of the purchase price. Trudel failed to disclose its plans to sell the home and continued to assure MacGilvary that she could remain there. Trudel also provided no accounting to MacGilvary.

3. Distressed Home Conveyance

Trudel argues that the purchase of the property and subsequent lease agreement with MacGilvary was not a "distressed home conveyance" under RCW 61.34.020(5). We disagree.

RCW 61.34.020(5) defines a "distressed home conveyance" to mean a transaction in which:

> (a) A distressed homeowner transfers an interest in the distressed home to a distressed home purchaser;
>
> (b) The distressed home purchaser allows the distressed homeowner to occupy the distressed home; and
>
> (c) The distressed home purchaser or a person acting in participation with the distressed home purchaser conveys or promises to convey the distressed home to the distressed homeowner, provides the distressed homeowner with an option to purchase the distressed home at a later

date, or promises the distressed homeowner an interest in, or portion of, the proceeds of any resale of the distressed home.

Trudel does not dispute that subsections (a) and (b) have been met. Rather, Trudel contends that subsection (c) does not apply because leasing the property to MacGilvary cannot be considered a "conveyance." We disagree.

First, when construing the DPCA most favorably to protect the vulnerable homeowner, a lease of property is a conveyance. Washington case law strongly supports this proposition. See Eastwood v. Horse Harbor Found. Inc., 170 Wn.2d 380, 241 P.3d 1256, 1260, (2010) ("A lease is a contract as well as a conveyance of property interest."); Resident Action Council v. Seattle Hous. Auth., 162 Wn.2d 773, 778, 174 P.3d 84 (2008) ("Generally, a lease is a conveyance of a limited estate for a limited term with conditions attached."); Preugschat v. Hedges, 41 Wn.2d 660, 663, 251 P.2d 166 (1952) ("A lease is both a present conveyance and executory contract."). Thus, it is logical to interpret "conveyance" in RCW 61.34.050(c) to include a lease of property.

Trudel contends that this court should not interpret a conveyance to include a lease because RCW 61.34.020(3)(xii) contains both the terms "lease" and "conveyance" in a single list. This narrow reading of the statute is incorrect. Whereas a lease may be a type of conveyance, conveyance is a much more encompassing term. This same list includes "grant," "sale," "trust," and "gift." It does not stand to reason that we would read out the meaning of each of these words in the statute just because they overlap with the term "conveyance" in a single provision. "Conveyance" may account for additional transfers of property interest beyond the few enumerated in this provision.

Trudel also ignores explicit mention of property rental in one of the very provisions of the DPCA that governs distressed home conveyances and distressed

home purchasers. RCW 61.34.090 dictates the precise terms to be included in a distressed home reconveyance by a distressed home purchaser. RCW 61.34.090(6) states that the contract provided to the distressed homeowner by the distressed home purchaser must contain:

> A complete description of the terms of any related agreement designed to allow the distressed homeowner to remain in the home, such as a <u>rental agreement</u>, repurchase agreement, or lease with option to buy.[6]

The legislature would not have drafted this provision had it not contemplated that a rental agreement could be a form of conveyance under RCW 61.34.020(5)(c).

Furthermore, Trudel's promise that MacGilvary could remain on the property supports a conveyance. Trudel told MacGilvary that she could "stay on" in exchange for her home. Trudel assured MacGilvary that it would not sell the property and that she could remain in her home "forever." Paired with the lease to MacGilvary, this promise that she would remain on the property constitutes a conveyance under RCW 61.34.020(5)(c).

Because this transaction was a distressed home conveyance, Trudel was a distressed home purchaser. RCW 61.34.020(4), (5). As a distressed home purchaser Trudel was subject to, and consequently violated, additional provisions of the DPCA.

A distressed home purchaser is subject to RCW 61.34.080, .090, .100, .110, and .120. RCW 61.34.080 requires a distressed home purchaser to enter into a distressed home reconveyance in the form of a written contract. RCW 61.34.090, .100, and .110 contain the proper form of the written contract, a requirement that the distressed homeowner has a right to cancel, and the proper form of the contractual provision

---

[6] (Emphasis added.)

governing the right to cancel. RCW 61.34.120 proscribes certain actions by distressed home purchasers.

The required contract for a distressed home reconveyance must contain: (1) information about the distressed home purchaser; (2) the distressed home's address; (3) the consideration paid for the distressed home; (4) a description of terms of payment or services rendered for purchase of the distressed home; (5) the time in which possession of the distressed home is transferred; (6) a description of terms designed to allow the distressed homeowner to remain in the home; (7) a description of any interest that the homeowner maintains in the distressed home; (8) a notice of cancellation; and (9) a statutorily provided notice clause. RCW 61.34.090(1)-(9).

A distressed home purchaser must provide a distressed homeowner with a right to cancel a contract to purchase a distressed home. The distressed homeowner may cancel the contract within five business days. This right to cancel must be provided in the original purchase contract via a statutorily provided clause. RCW 61.34.090(8); RCW 61.34.110.

Distressed home purchasers are prohibited from certain practices. In part, a distressed home purchaser may not enter into a distressed home conveyance without verifying that the distressed homeowner can afford it. RCW 61.34.120(1). A distressed home purchaser cannot fail to ensure that the distressed homeowner has received consideration of at least 82 percent of the value of the distressed home as of the date of eviction or voluntary relinquishment. RCW 61.34.120(2).

The record shows that Trudel violated nearly every provision of RCW 61.34.080, .090, .100, .110, and .120. Trudel did not provide MacGilvary with a written contract,

much less the form contemplated by the DPCA. MacGilvary had no option to rescind her offer. Trudel also made no assurances that MacGilvary, whose sole source of income was $400 in monthly disability benefits, could afford the proposed rent to stay in her home. Finally, Trudel failed to demonstrate that it made efforts to reasonably compensate MacGilvary for her home.

The DPCA aims to protect consumers from fraudulent and predatory schemes. One such scheme is a scenario where an individual or business approaches a homeowner on the eve of foreclosure with a promise to purchase his or her debt-encumbered home, and subsequently conveys an interest in that home. Under this scenario the DPCA affords the consumer clear explanations of the exchange, ensures that the exchange was fair, and offers an opportunity to rescind on what may be an emotionally difficult decision—selling one's distressed home. It is this precise fraudulent and predatory scheme that Trudel participated in when purchasing MacGilvary's home with a promise that she could remain there, and this precise scheme that violated nearly every provision of the DPCA.

B. The CPA

Trudel argues in its reply that, because it did not violate the DPCA, it likewise did not violate the CPA. We disagree.

In establishing that any violation of the DPCA is "an unfair method of competition" under the CPA, the legislature found "the practices covered by [the DPCA] are matters vitally affecting public interest." RCW 61.34.040(1). Thus, a violation of the DPCA is a per se violation of the CPA. Jametsky, 179 Wn.2d at 764-65.

Because Trudel violated the DPCA, we hold that it has violated the CPA as well.

C. Bad Faith

Trudel argues that because there was no equity skimming, there was no distressed home conveyance, and it did not act as a distressed home consultant, the trial court erred in determining that it acted in bad faith. We disagree.

As discussed above, Trudel's actions violated nearly every provision of the DPCA. Trudel approached MacGilvary, a vulnerable individual on the eve of the foreclosure sale of the home in which she raised her children, with a promise to save the home from foreclosure. With this promise came assurances that MacGilvary could remain on the property forever. Instead, Trudel purchased the property, continued to make false assurances that MacGilvary could remain in it, but later sold the property for nearly triple the purchase price. Trudel's purchase of MacGilvary's home was ambiguous, rapacious, and between two individuals with stark differences in business sophistication.

Trudel was required to provide appropriate notice, maintain fiduciary duties, act in good faith, provide a right to cancel, and not engage in certain practices. Trudel failed its requirements in legion. For these reasons, we agree with the trial court that Trudel acted in bad faith.

D. Joint and Several Liability

Trudel argues that Wayne and Lisa should not be held liable for the actions taken on behalf of Trudel, LLC. Because this argument raises a question of fact not amenable to summary judgment, we disagree.

"[T]wo separate, essential factors must be established" for a court to pierce the corporate veil. Dickens v. All. Analytical Labs, LLC, 127 Wn. App. 433, 440, 111 P.3d

-18-

889 (2005). First, the corporate form must be used to violate or evade a duty. Second, the fact finder must establish that disregarding the corporate veil is necessary and required to prevent an unjustified loss to the injured party. Columbia Asset Recovery Grp., LLC v. Kelly, 177 Wn. App. 475, 486, 312 P.3d 687 (2013). If a court determines that the corporate veil may be pierced, members of the limited liability company may be personally liable for acts or liabilities of the company. Chadwick Farms Owners Ass'n v. FHC LLC, 166 Wn.2d 178, 199, 207 P.3d 1251 (2009). "Whether a corporate form should be disregarded is a question of fact." Northgate Ventures LLC v. Geoffrey H. Garrett PLLC, 10 Wn. App. 2d 850, 866, 450 P.3d 1210 (2019).

Here, the trial court found on summary judgment that Wayne, Lisa, and Trudel, LLC were jointly and severally liable for violating the DPCA and CPA. There is, however, a genuine issue of material fact about whether Trudel, LLC's corporate veil should be pierced.

Trudel asserts that during every interaction with MacGilvary, Wayne was acting as an agent of Trudel, LLC. On the contrary, MacGilvary claims that Trudel, LLC is an alter ego of Wayne because of the many decisions that he makes for the company. She also claims that the commingling of personal and company assets further supports piercing the corporate veil. Because whether Trudel's corporate veil should be disregarded is a question of fact, and because the facts here are in dispute, we remand to the trial court.

E. Costs and Attorney Fees

MacGilvary requests costs and attorney fees on appeal. Under RAP 18.1, a party may request reasonable attorney fees on appeal if an applicable law grants the

party the right to recover.  The CPA provides for an award of costs and reasonable attorney fees and may apply to appeals.  Sherwood v. Bellevue Dodge, Inc., 35 Wn. App. 741, 669 P.2d 1258 (1983).  Because Trudel violated the DPCA and, in turn, the CPA, we award attorney fees on appeal.  On remand, the trial court should determine the amount of fees and expense reasonably incurred in this appeal.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

_Mann, C.J._

WE CONCUR:

_Chun, J._          _Smith, J._